DAVID NASSIF & others, trustees, *vs.* BOSTON
AND MAINE RAILROAD.

Suffolk.   December 11, 1959. — March 15, 1960.

Present: WILKINS, C.J., SPALDING, COUNIHAN, WHITTEMORE, &
CUTTER, JJ.

*Contract,* For sale of real estate, Option, Validity. *Equity Jurisdiction,*
Specific performance, Retention of suit for further relief. *Evidence,*
Relevancy and materiality. *Equity Pleading and Practice,* Decree.

In a carefully drawn contract setting forth with precision the obligations
of the parties, mere recitals in a preamble of the contract could not be
taken to impose an obligation in addition to those so set forth. [563]
An indenture whereby a railroad gave a trust an option to purchase an
area of the railroad's land suitable for industrial development and
production of freight revenue was construed as not obligating the trust
to construct any buildings on the option area, although the option

followed a conveyance of other land of the railroad in the vicinity to the trust and the construction of buildings thereon by the trust and the indenture contained certain provisions as to the nature of the development of the option area, if undertaken, and required approval by the railroad of the initial occupants of any buildings constructed in the option area. [563–564]

A contract giving an option to purchase land suitable for industrial development was not invalid for uncertainty, nor was it inappropriate to order specific performance of the prospective seller's obligation to convey the land upon exercise of the option, in that the contract did not provide a time for beginning building development of the land or for the progress or completion of the development by the prospective buyer, where the contract imposed no obligation on the prospective buyer to construct any buildings on the land, or in that the contract required approval, "not [to] be unreasonably withheld," by the prospective seller of the initial occupants of any buildings constructed thereon. [564–566]

In a suit in equity for specific performance of an obligation to convey land upon exercise of an option to purchase the land given by a contract which, in an amended form, imposed no obligation on the prospective buyer to construct any buildings on the land, evidence as to the financial ability of the prospective buyer to carry out a building program was properly excluded as irrelevant, as was also evidence as to whether the prospective buyer had met conditions precedent which, even if they were set forth in the contract in its original form, had been wholly eliminated by the amendment thereof. [566]

In a final decree in a suit in equity ordering the defendant to convey land to the plaintiff pursuant to an exercised option to purchase it given by the defendant to the plaintiff in a contract, it was appropriate to include a provision for the court's retaining jurisdiction of the case and the parties in view of complex provisions in the contract creating obligations to be performed after such conveyance. [566]

A provision of a final decree in a suit in equity that the decree did not "estop either party from enforcing any rights against the other . . . in law or in equity" was unnecessary and should be omitted. [567]

BILL IN EQUITY, filed in the Superior Court on November 16, 1956.

The suit was heard by *Goldberg, J.*

*Arthur L. Brown & Lawrence R. Cohen,* (*Albert R. Mezoff & Thomas E. Goode* with them,) for the defendant.

*George A. McLaughlin,* (*Arthur M. Gilman* with him,) for the plaintiffs.

CUTTER, J. This is a bill in equity by the trustees of Nassif Realty Trust (the trust) to compel the defendant (the railroad) to convey premises (the option area) on Rutherford

Avenue in Charlestown. The trust alleged that it had exercised an option under an indenture of January 15, 1954 (the 1954 indenture) to purchase the option area which is near land acquired by the trust from the railroad in 1952. The trial judge concluded that the trust was entitled to specific performance of the railroad's agreement under the option and a final decree was entered directing a conveyance. The railroad has appealed. The evidence is reported.

The trial judge found the following facts. For many years prior to 1952, the railroad had owned freight yards on Rutherford Avenue susceptible of development for industrial and freight revenue purposes. The area contained "a number of very old and unsightly . . . freight houses." Negotiations between David Nassif, later one of the trustees of the trust, and the railroad resulted in an agreement dated July 18, 1952, (a) for the conveyance of specified land to Nassif and his partners, who were to construct buildings and obtain tenants approved by the railroad, and (b) for an option to the partners to purchase other land in the area "under specific conditions for similar purposes." The agreement was extended or amended several times. The trust was formed September 22, 1952, and by deed of October 17, 1952, the railroad conveyed to the trust two parcels in accordance with the agreement of July 18, 1952. The trust paid to the railroad $25,000 in cash and gave to the railroad a mortgage and note for $100,000.

Simultaneously, on October 17, 1952, an agreement[1] was

---

[1] The background of this agreement of October 17, 1952, was described in its preamble, which was not struck out by the amendment of the agreement by the 1954 indenture. This preamble, so far as relevant, reads: "It is proposed that the . . . [trust] will erect on . . . [the] lots [conveyed in 1952] buildings of steel and concrete or masonry for use by occupants approved by the [r]ailroad who will be engaged in warehousing, producing, distributing or dealing in food products or other merchandise or materials. It is also proposed that if within a period of three years from the date hereof the construction of such buildings for such occupants shall have been completed or commenced under arrangements which give reasonable assurance of completion, the . . . [trust] shall have the right to purchase upon the terms hereinafter expressed certain additional lands of the [r]ailroad hereinafter described. It is further proposed that spur tracks are to be constructed to serve said buildings, that the price paid . . . to the [r]ailroad for said land shall be adjusted, and that the proposed construction may require the relocation of said proposed way and said spur track areas, all as hereinafter provided."

executed which contained "specific provisions for the conditions under which the option could be exercised . . . the terms thereof, and the obligations of the plaintiffs thereafter." The $100,000 mortgage "provided that it was also 'to secure performance by the . . . [trust] of all . . . obligations of the'" trust contained in the October 17 agreement. The deed of October 17, 1952, was reformed and amended on January 15, 1954, to change the description of the land conveyed in 1952. This reformation indenture was executed contemporaneously with the 1954 indenture. The $100,000 mortgage of October 17, 1952, was then discharged and the trust gave to the railroad a new mortgage, dated January 15, 1954, for $95,000. This latter mortgage provided that it was "also to secure performance . . . of all the obligations of the" trust contained in the 1954 indenture. There was "a further slight modification on June 15, 1954."

The 1954 indenture modified the agreement of October 17, 1952, with respect to the option in a manner discussed more fully later in this opinion, and in various other respects,[2]

---

[2] The most important provisions of the 1954 indenture may be summarized: "1. . . . [C]onstruction of . . . buildings shall not be undertaken . . . until the original occupants . . . have been approved in writing by the [r]ailroad, which approval shall not be unreasonably withheld." 2. The minimum price to be paid to the railroad for the land conveyed under the reformed 1952 deed is defined and a formula is provided for the computation of additional consideration. 3. The trust is given (1) an option (since exercised) to purchase lot 4, a part of the original option area, and (2) options to purchase the option area or parts thereof, including lot 4 "if the first option has not been exercised, but excluding the fee and soil of proposed ways." The "second options may be exercised as to the whole of . . . [the option area], or as to appropriate parts thereof from time to time which shall in general conform to the pattern of the development of [l]ots 1 through 4 . . . and shall be subject to approval of the [r]ailroad of such conformity, which approval shall not be unreasonably withheld. . . . If any option is exercised, the premises shall be conveyed . . . 90 . . . days thereafter" on specified terms, which need not be set out here. With any notice exercising the second option, the trust must "submit to the [r]ailroad a sketch showing the development of the desired area into building areas, proposed ways and spur track areas, which shall in general follow the pattern of the development of [l]ots 1 through 4." Each "deed shall convey to the . . . [trust] the building areas and spur track areas shown on the plan, excluding the fee and soil of any proposed ways." When the option is exercised as to any part of the option area other than lot 4, and as the deed is delivered, the trust must deliver "a promissory note in an amount which bears the same proportion to . . . $125,000 . . . as the aggregate area of the number of square feet contained in the building areas and spur track areas . . . [to be purchased] bears to . . . 238,642 . . . square feet." Provision was also made for the determination of additional compensation by formula and about other matters in

but, under both agreements, "the option was to be exercised on or before October 17, 1955." At the railroad's suggestion, the time for exercise of the option was extended to November 14, 1955. On that day the trust by letter exercised the option to purchase portions of the option area, excluding street areas shown on a plan accompanying the letter. After further correspondence between the trust and the railroad, in which the trust directed the railroad's attention to its obligations under the option, the trust gave notice on February 10, 1956, that its representatives would be present at the Suffolk County registry of deeds on February 13, 1956, to receive a conveyance and to perform its duties under the option. The railroad did not appear and has refused conveyance of the option area. On April 11, 1955, there had been a change in the management of the railroad. The trustees, at the railroad's request, thereafter had delayed exercising the option to give the railroad's new officers and counsel time to study the contracts.

In 1953 and 1954 buildings for tenants approved by the railroad had been erected upon several lots formed from the area sold to the trust by the 1952 deed (as reformed in 1954). Arrangements had also been made for placing a building on a parcel known as lot 4, a part of the original 1952 option area, in fact conveyed to the trust by deed dated January 18, 1954. The judge found that the fair market value of the properties was at least $1,475,000, approximately the cost of the buildings and land. The trust, as of the date of trial (early in July, 1958), owed on notes secured by mortgages covering the land then owned by the trust and four buildings (including mortgages to the railroad) a total of about $997,653. The trust thus then had an equity in the properties of "at least $478,000."

The judge concluded (1) that the trust had "been diligent in endeavoring to secure tenants who would be approved by

respects usual in real estate agreements. The trust undertook for twenty years not to lease or sell any part of the buildings to be constructed to anyone other than the approved occupant and not to sell any of the land without first offering the same to the railroad upon the same terms.

the" railroad; (2) that the trust has "at all times acted in good faith and . . . [has] not been guilty of . . . inequitable conduct"; (3) that the pertinent "contracts are valid and binding"; (4) that the railroad "is well secured for future performance by the . . . [trust] of all . . . [its] obligations to the" railroad; and (5) that the trust on February 13, 1956, was "ready, able and willing to perform."

The railroad contends that these conclusions were not justified, that the contracts between the trust and the railroad are invalid for uncertainty, that various legal and practical reasons make specific performance inappropriate, and that there was prejudicial error in the exclusion of certain evidence.

1. The principal contract document, now effective, is the 1954 indenture which substituted new provisions for all the substantive provisions of the agreement of October 17, 1952. The original agreement of October 17, 1952, had provided that if "within three years from . . . [its] date . . . the construction on . . . [the] premises of buildings . . . for occupants approved by the [r]ailroad shall have been completed or commenced under arrangements which give reasonable assurance of completion . . . thereafter, and if such buildings provide or will . . . provide . . . at least 125,000 square feet of interior floor space, and if within said three-year period the . . . [trust] shall have entered into at least one bona fide contract . . . for . . . a building . . . upon the adjacent land of the [r]ailroad [the option area] . . . [then] the . . . [trust] shall have the . . . option to purchase" the option area, with the exception of the fee in proposed ways, upon stipulated terms. By the 1954 indenture this condition precedent to the exercise of the option was wholly eliminated and for it was substituted (see footnote 2, *supra*) an absolute option (a) to purchase lot 4 and (b) to purchase the whole or designated parts of the option area (exclusive of the fee in proposed ways). The new 1954 options were not in any respect made conditional upon the construction of buildings on the land conveyed in 1952. That construction, as stated above, had substantially been done.

No obligation is now imposed on the trust to build upon the option area by the preamble (see footnote 1, *supra*) to the agreement of October 17, 1952, which was not eliminated by the 1954 indenture. The preamble contains merely recitals, not undertakings. Indeed, certain recitals, which related to the construction of specified buildings as a condition precedent to the exercise of the original options, became out of date at least as early as the signing of the 1954 indenture. At most, the preamble constitutes a general statement of the 1952 plans of the parties and a summary description of some of the background of the negotiations. If the parties had intended to impose on the trust contract obligations to build on the option area, it would have been natural for them to have stated these provisions, not in the preamble, but in explicit covenants or agreements.

The 1954 indenture obviously was carefully drawn by counsel. In it the obligations of the parties are stated with precision. We thus are not considering an inadequate document, which lacks explicit provision with respect to the consideration to be paid to the railroad. There is no occasion for resort to recitals in the preamble to determine matters relating to that consideration. Cf. *Pearlstein* v. *Novitch*, 239 Mass. 228, 231–232. Here the price and the consideration for the conveyances to be made following exercise of the options were set out in great detail, without any statement that an obligation to build on the option area was a part of that consideration. Doubtless, the recitals of the preamble may be used to assist in interpreting other parts of the contract, but, as such, they impose no obligations upon the trust.

The provisions of the 1954 indenture other than the preamble also do not purport to require any building upon the option area, although the instrument defines in various respects the character of a building program, if in fact one is undertaken. These provisions do no more than to require the trust to make (a) its partial exercises of option "in general conform to the pattern of the development" of the lots acquired in 1952 and (b) its sketch plan submitted with

any notice exercising the options "in general follow the [same] pattern." The 1954 indenture, however, does not leave the railroad wholly without influence upon the development of the option area, for art. 1 provides that with respect to "all buildings . . . *on any of said land* . . . construction . . . shall not be undertaken . . . until the original occupants . . . shall have been approved in writing by the [r]ailroad, *which approval shall not be unreasonably withheld*" (emphasis supplied). The railroad's power reasonably to disapprove original occupants thus enables it to guide the course of the project to some extent, but it does not require the trust to undertake such a project upon the option area.

In the circumstances, we find in the 1954 indenture, as amended in respects not here relevant, no undertaking by the trust to begin, to carry on, or to complete any construction on the option area. In the absence of an explicit covenant, requiring the trust to build in a specified manner upon the option area, we infer that the then management of the railroad reasonably relied, to bring about the construction of buildings promptly, upon the enlightened self interest of the trust and the economic pressure upon the trust to receive rents which would enable it to meet payments of interest and principal under the various mortgages.

2. The various undertakings of the parties are sufficiently definite and certain to constitute binding contracts. See *Cygan v. Megathlin,* 326 Mass. 732, 733–734; *Caggiano v. Marchegiano,* 327 Mass. 574, 582; *Simons v. American Dry Ginger Ale Co. Inc.* 335 Mass. 521, 523–524; Restatement: Contracts, §§ 32, 370.

The principal uncertainty which the defendant suggests in the agreement is that the contract does not set a time "for the commencement of the development on the option area, for its progress, or for its completion." As stated above, no obligation is imposed on the trust to proceed with construction on the option area. Accordingly, there was no occasion for including in the contract any time schedule for commencement or completion of such construction. We do

not suggest that failure to specify time would have been fatal in any case.

There is also no uncertainty, fatal to the existence of a contract or to specific performance, in the requirement that, after the conveyance of the option area, its original occupants are to be subject to approval by the railroad, which is not to "be unreasonably withheld." Such provisions are not uncommon in leases, especially with respect to assignments or subletting by the lessee. The words, "which approval shall not be unreasonably withheld," prescribe that the railroad shall act in accordance with usual standards of reasonableness. See *Jones* v. *Parker*, 163 Mass. 564, 566–567; *Edelman* v. *F. W. Woolworth Co.* 252 Ill. App. 142, 145; *Singer Sewing Mach. Co.* v. *Eastway Plaza, Inc.* 5 Misc. 2d (N. Y.) 509, 510–511; *Broad & Branford Place Corp.* v. *J. J. Hockenjos Co.* 132 N. J. L. 229, 232–236; 32 Am. Jur., Landlord and Tenant, §§ 343, 412; Annotation, 31 A. L. R. 2d, 831. See also *Hedgecock* v. *Mendel*, 146 Wash. 404, 412–415; Am. Law of Property, § 3.58, pp. 305–306; Powell, Real Property, § 245; Tiffany, Real Property, § 118. In *Gruman* v. *Investors Diversified Servs. Inc.* 247 Minn. 502, 509–510, although a different result was reached where there were no words requiring the lessor to act reasonably, the effectiveness of such words was recognized. See *Friedman* v. *Thomas J. Fisher & Co. Inc.* 88 Atl. 2d 321, 323 (Munic. Ct. App. D. C.). Cf. *Granite Trust Bldg. Corp.* v. *Great Atl. & Pac. Tea Co.* 36 F. Supp. 77, 78 (D. Mass.).

3. In view of our interpretation of the 1954 indenture as imposing no obligation upon the trust to construct buildings upon the option premises, we perceive no practical obstacles to ordering conveyance to the trust of the specified parts of the option area. There is no obligatory construction of buildings by the trust which requires prolonged and detailed court supervision in order to assure the railroad of any consideration to which it is entitled under the language of the 1954 indenture. The railroad will receive at the time of its conveyance the notes and amended mortgages which it is entitled to receive. Cf. *Barrell* v. *Britton*, 258 Mass. 383,

386–387; Restatement: Contracts, § 373. There is no merit to the contention that relief must be denied on the ground that a decree for specific performance will result in "injustice or oppression" (see *Morad* v. *Silva*, 331 Mass. 94, 98–100) or in undue difficulty of enforcement. See Restatement: Contracts, §§ 371, 372; Williston, Contracts (Rev. ed.) § 1423. See also *Sanford* v. *Boston Edison Co.* 316 Mass. 631, 634–635; *Forte* v. *Caruso*, 336 Mass. 476, 483–484; Corbin, Contracts, § 1197.

4. Our interpretation of the 1954 indenture also confirms the correctness of the trial judge's exclusion of evidence about the financial ability of the trust to carry out a building program. That ability is irrelevant if there is no affirmative duty on the trust to carry out such a program. Similarly, it is immaterial whether the trust has been diligent in the past in meeting the conditions precedent to the right to exercise its option under the agreement of October 17, 1952. Whatever condition precedent in the form of building construction there was to the exercise of the option was removed by the 1954 indenture which made absolute the trust's right to exercise the option.

5. We agree with the trial judge that the complexity of the 1954 indenture, with its provisions for spur tracks, easements, additional consideration, and approval of original occupants of buildings and other similar matters, makes it appropriate for the Superior Court to retain jurisdiction of the case and the parties, so that the performance of the railroad's various obligations arising upon the exercise of the option will be assured without the initiation of new proceedings, and so that either party may easily have judicial determination of questions arising in carrying out the 1954 indenture. In the course of such supervision, the reasonableness of any withholding of railroad approval of original tenants may present an issue for the judge's determination. See *Jones* v. *Parker*, 163 Mass. 564, 566–567; *Broad & Branford Place Corp.* v. *J. J. Hockenjos Co.* 132 N. J. L. 229, 232. See also *Cygan* v. *Megathlin*, 326 Mass. 732, 734–736. Such retention of jurisdiction is not unusual.

See e.g. *Samia* v. *Central Oil Co. of Worcester,* 339 Mass. 101, 130.

6. The provision of par. 6 of the final decree that it does not "estop either party from enforcing any rights against the other, either in law or in equity," seems unnecessary and possibly confusing. As to matters now finally determined in this proceeding, the parties will be bound by the final decree. As to other matters, except as barred by usual principles of res judicata and collateral estoppel, the parties may indulge in further litigation in this or any other proceeding.

7. The final decree will be modified by the omission of par. 6. As so modified, it is affirmed. The trust is to have costs of this appeal.

*So ordered.*